# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Happy Home Health Care, Inc.,<br><br>                    Plaintiff,<br><br>v.<br><br>United States of America,<br><br>                    Defendant. | Case No. 13-cv-3646 (MJD/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

Eric William Johnson, U.S. Bank Building, 101 East Fifth Street, Suite 910, St. Paul, Minnesota 55101, for Plaintiff Happy Home Health Care, Inc.

Michael R. Pahl, United States Department of Justice, Tax Division, P.O. Box 7238, Ben Franklin Station, Washington, D.C. 20044, for Defendant United States of America

HILDY BOWBEER, United States Magistrate Judge

Happy Home Health Care, Inc. ("HHHC Inc.") brought suit against the United States of America, alleging that Internal Revenue Service ("IRS") levies on its corporate bank accounts and reimbursement payables from the State of Minnesota, issued for the purpose of collecting the unpaid tax liabilities of HHHC Inc.'s owner, Sue Yang, were wrongful. The United States contends the levies were lawful because HHHC Inc. is Sue Yang's alter ego. Alternatively, the United States contends the levies were lawful because Sue Yang fraudulently transferred the assets of his sole proprietorship, Happy

Home Health Care,[1] to HHHC Inc. without consideration or proper documentation in order to escape liability for his federal tax debt.

The case was referred to this Court to preside over a bench trial and submit proposed findings of fact and conclusions of law. (Order of Referral, July 17, 2015 [Doc. No. 35].) Trial was held on November 3, 2015. The United States submitted its proposed findings of fact and conclusions of law on January 4, 2016, and HHHC Inc. submitted its proposed findings of fact and conclusions of law on February 3, 2016. The matter was taken under advisement at that time. Based on the testimony and exhibits offered at trial, and the oral and written submissions by counsel, the Court makes the following proposed findings of fact and conclusions of law.

## I.   PROPOSED FINDINGS OF FACT

### A.   Overview of Sue Yang's Businesses:  HHHC Inc., Happy Home Health Care, and Peev Tax Service

1.   Sue Yang operated a home health care business known as Happy Home Health Care since 2004, and a tax-preparation business known as Peev Tax Service ("Peev") since 2003.[2]

2.   Sue Yang originally operated Happy Home Health Care and Peev as sole proprietorships.[3]

3.   Sue Yang knew he was required to report all income earned by Happy

---

[1] Unless otherwise indicated, "HHHC Inc." refers to Plaintiff, an incorporated entity, and "Happy Home Health Care" refers to the sole proprietorship owned by Sue Yang.
[2] Trial Transcript (hereinafter "Tr.") 12:10-15, 57:1-6; Def. Ex. 52 (Sue Yang Dep.) at 7:17-22.
[3] Tr. 12:10-15, 57:1-6.

Home Health Care on IRS Schedule C forms and to report his taxable income from that entity on his individual income tax returns.[4]

4.      Sue Yang incorporated Peev and HHHC Inc. in 2007.[5]

5.      According to HHHC Inc.'s TCF Bank checking account statements, Sue Yang began operating HHHC Inc. as an incorporated entity in February 2009.  Account activity for that month increased significantly from the previous statement, including checks and withdrawals in the amount of $74,307.73 and deposits and additions in the amount of $59,305.18.[6]

6.      In 2008, Sue Yang reported a $49,264 profit from his sole proprietorship Happy Home Health Care.[7]

7.      Both Happy Home Health Care, as a sole proprietorship, and HHHC Inc., as a corporation, provided home health care workers to individual clients.[8]  At any given time, HHHC Inc. employed about 85 to 100 individuals.[9]

8.      Happy Home Health Care and HHHC Inc. were licensed and regulated by the Minnesota Department of Human Services.[10]

9.      HHHC Inc. was audited by the Minnesota Department of Human Services every year and its license was never terminated.[11]

---

[4] Tr. 12:18-25, 13:1-2.
[5] Def. Ex. 52 at 38:1-7; Pl. Ex. 1.
[6] Pl. Ex. 5 at 1-2.
[7] Def. Ex. 6.
[8] Tr. 119:13-20, 120:15-17.
[9] Tr. 120:18-20.
[10] Tr. 116:6-25, 117:1.
[11] Tr. 116:16-25, 117:1, 118:14-24.

10.     All of HHHC Inc.'s income came from the Minnesota Department of Human Services.[12]  To obtain payment, HHHC Inc. processed the payroll, paid the employees, and billed the Minnesota Department of Human Services, which then reimbursed HHHC Inc.[13]

11.     Sue Yang testified he incorporated HHHC Inc. to comply with a licensing requirement by the Minnesota Department of Human Services.[14]

12.     HHHC Inc.'s main business expenses were employee payroll, worker's compensation insurance, employment taxes, and insurance.[15]

13.     HHHC Inc. maintained its own bank account from 2009 through 2013.[16]

14.     HHHC Inc. paid its business expenses from its corporate bank account.[17]

15.     HHHC Inc. ceased operating in 2013 when the IRS levied its bank and other accounts and HHHC Inc. could not pay its employees.[18]

**B.     Sue Yang Incurs a Federal Tax Debt**

16.     In 2008, the IRS began auditing Sue Yang's federal individual income tax returns for the years 2005-2008.[19]

17.     Audits of Sue Yang's individual tax returns and Schedule C forms for tax years 2005-2008, all of which were prepared and filed by Sue Yang, revealed that Sue

---

[12] Tr. 119:21-25.
[13] Tr. 120:3-5.
[14] Tr. 115:14-17, 116:15-17.
[15] Tr. 123:9-12.
[16] Pl. Ex. 5.
[17] Tr. 122:24-25, 123:1-5.
[18] Tr. 119:2-12.
[19] Def. Ex. 52 at 22:8-13; *see* Def. Exs.1-8.

Yang had falsely claimed refunds, failed to report interest income, underreported other income including self-employment income, and overstated expenses for Happy Home Health Care.[20]

18.     Based on information provided in the returns and the results of the audits, the IRS concluded that Sue Yang had committed fraud on his tax returns and therefore assessed substantial fraud penalties, in addition to other penalties, taxes, and interest.[21]

19.     The IRS determined on an Income Tax Examination Changes Form dated December 16, 2008, that Sue Yang owed $44,449.48 in taxes, penalties, and interest for 2005; and $41,860.08 in taxes, penalties, and interest for 2006.[22]  The IRS determined on an Income Tax Examination Changes Form dated April 1, 2009, that Sue Yang owed $93,219.20 in taxes, penalties, and interest for 2007; and on an Income Tax Examination Changes Form dated December 16, 2010, that Sue Yang owed $69,473.26 for 2008.[23]

20.     The language and instructions on the Income Tax Examination Changes Forms indicate that the documents were sent to Sue Yang.

21.     The Court finds that Sue Yang, as both the tax preparer and the taxpayer, was given notice of the information contained on the forms within days or weeks of the dates they were issued.

22.     Sue Yang testified in his deposition that he first knew in 2007 about his

---

[20] Def. Exs. 2, 5, 7.
[21] Def. Exs. 2, 5, 7.
[22] Def. Ex. 2 at US016.
[23] Def. Exs. 5 at US054, 7 at US075.

2005 tax debt.[24]

23.     Sue Yang did not contest any of the IRS's determinations, nor did he make any attempt to pay the amounts owed.

24.     The United States filed federal tax liens against Sue Yang on April 16, 2010.[25]

25.     Sue Yang admitted the tax debt was beyond his ability to pay.[26]

26.     Sue Yang struggled to support his family and lost his house to foreclosure in 2008.[27]

27.     By 2009, Sue Yang was indebted to several other creditors who had obtained judgments against him for more than $88,000.[28]

28.     On July 18, 2013, the IRS prepared a Notice of Levy on HHHC Inc.'s corporate bank account at TCF National Bank, naming HHHC Inc. the alter ego, nominee, or transferee of Sue Yang.[29]  The total amount due was $330,118.34.[30]  The IRS prepared similar Notices of Levy for the State of Minnesota later in 2013.[31]

29.     On July 19, 2013, the IRS prepared a Notice of Federal Tax Lien assessing tax, penalties, and interest for the 2005 to 2008 tax years in the amount of $277,894

---

[24] Def. Ex. 52 at 28:15-22.
[25] Def. Ex. 8 at US093.
[26] Def. Ex. 52 at 37:10-13.
[27] Tr. 20:24-25; 21:1-5.
[28] Def. Ex. 8 at US093-94.
[29] Pl. Ex. 2.
[30] Pl. Ex. 2.
[31] Pl. Ex. 2.

against HHHC Inc. as the alter ego, nominee, or transferee of Sue Yang.[32]

30.     The IRS collected $258,307.73 through the levies issued in 2013 in the

name of HHHC Inc. as the alter ego, nominee, or transferee of Sue Yang, to satisfy Sue

Yang's tax debt.[33]  The levies were issued to entities holding assets and property of

HHHC Inc., including HHHC Inc.'s corporate bank account and reimbursement payables

from the Minnesota Department of Human Services.[34]

### C.     Sue Yang Incurs a $47,000 Tax Debt to the State of Minnesota

31.     On November 11, 2008, the Minnesota Department of Labor and Industry

sent Sue Yang an order to comply and a notice of penalty assessment for failing to have

worker's compensation insurance from July 1, 2005, to June 30, 2008.[35]

32.     The Minnesota Department of Labor and Industry further notified Sue

Yang that he would be subject to a $47,759 penalty.[36]

33.     The Minnesota Department of Labor and Industry obtained a judgment

against Sue Yang in the amount of $47,759, which he has not paid.[37]

### D.     Sue Yang's Boat

34.     Sue Yang purchased a boat for $29,000 cash in 2012.[38]

35.     Sue Yang testified that he owned the boat, but it was titled in his wife's

---

[32] Def. Ex. 12.
[33] Compl. ¶¶ 11, 12; (Order at 3, Mar. 31, 2015 [Doc. No. 25]).
[34] Compl. ¶ 11; (Order at 3 [Doc. No. 25]).
[35] Tr. 18:20-25.
[36] Tr. 19:5-11.
[37] Tr. 20:18-23.
[38] Tr. 26:20-24, 29:10-12.

name.[39]  He described it as a "really old boat," but in fact the boat was new when he

purchased it in 2012.[40]

36.     On August 1, 2013, Sue Yang and his wife signed under penalty of perjury

an IRS Form 433-A, Collection Information Statement for Wage Earners and Self-

Employed Individuals.[41]

37.     Sue Yang and his wife were required to list all personal vehicles, including

boats, on IRS Form 433-A, but they did not list the boat.[42]

**E.     Sue Yang's Incorporation of and Income from HHHC Inc.**

38.     Sue Yang's duties at both Happy Home Health Care and HHHC Inc.

included hiring employees, ensuring compliance with Department of Human Services

rules and regulations, working with a registered nurse to monitor clients, and hiring a

certified public accountant to do payroll and accounting.[43]

39.     Sue Yang filed Articles of Incorporation for HHHC Inc. with the State of

Minnesota on December 19, 2007, and the Secretary of State issued a Certificate of

Incorporation on the same day.[44]

40.     Each party submitted as an exhibit a document purporting to be HHHC

Inc.'s Articles of Incorporation.[45]  The United States' exhibit names Sue Yang as the

registered agent and the sole incorporator, and carries a December 19, 2007, file date

---

[39] Tr. 25:15-22, 26:20-24, 27:25, 28:1-2.
[40] Tr. 26:5-6; Def. Ex. 64.
[41] Def. Ex. 65; Tr. 31:11-15.
[42] Def. Ex. 65 at 3.
[43] Def. Ex. 52 at 9:3-15; Tr. 14:4-12, 15:10-13.
[44] Def. Ex. 53.
[45] Pl. Ex. 1; Def. Ex. 53.

stamp from the Secretary of State's office .[46]  HHHC Inc.'s exhibit is identical in all

respects to the United States' exhibit, including the file date stamp, but includes the name

and signature of Paul Thao as an additional incorporator.[47]  Neither party addressed the

apparent discrepancy during the trial.  Based on a comparison of the two documents, the

Court finds that United States' exhibit is a true and correct copy of the Articles of

Incorporation as filed on December 19, 2007, and that the document filed on that date

named only Sue Yang as an incorporator.

41.    Although Sue Yang incorporated HHHC Inc. in 2007, he did not begin

operating the business as a corporation until 2009.[48]  Sue Yang did not explain why he

waited two years to operate the business as a corporation.

42.    Sue Yang stated in an interrogatory answer that he was the sole owner of

HHHC Inc. at all times and the only person with signature authority for the corporate

bank account.[49]

43.    Neither party offered corporate records or testimony referring to the

existence of corporate records regarding the appointment of officers or directors of

HHHC Inc.

44.    A form captioned "TCF Bank Business Account Application and

Agreement" dated October 23, 2008, and filled out by Sue Yang, however, identifies Paul

Thao as a vice president of HHHC Inc., and gives him signature authority for HHHC

---

[46] Def. Ex. 53.
[47] Pl. Ex. 1.
[48] Tr. 46:24-25, 47:1, 47:8-14.
[49] Def. Ex. 49.

Inc.'s corporate bank account.[50]

45.     Sue Yang testified that Paul Thao is his brother-in-law's brother and owns 50% of HHHC Inc.'s stock.[51]  There are no HHHC Inc. corporate records, or any other records, showing the issuance or transfer of stock to or ownership of stock by Paul Thao.

46.     There is no corporate record of HHHC Inc. that establishes Paul Thao as a vice president of HHHC Inc.

47.     A form captioned "TCF Bank Business Account Application and Agreement/Savings and Certificate of Deposit Accounts" dated March 19, 2009, and filled out by Sue Yang identifies Sue Yang's brother, Kong Yang, as an authorized signatory to HHHC Inc.'s corporate bank account and as a vice president of HHHC Inc.[52]

48.     There is no corporate record of HHHC Inc. that establishes Kong Yang as a vice president of HHHC Inc.

49.     Although the HHHC Inc. Articles of Incorporation authorized the issuance of 100 shares of stock,[53] there is no corporate record or other document establishing that the shares were ever issued.  Sue Yang did not create or maintain corporate records for HHHC Inc. such as minutes, records of appointment or delegation of authority to officers, or stock certificates or other records of stock issuance or ownership, nor did he document the transfer of tangible or intangible assets from Sue Yang or Happy Home Health Care

---

[50] Def. Ex. 43.
[51] Tr. 54:8-13, 59:10-25, 60:1-8.
[52] Def. Ex. 44.
[53] Def. Ex. 53.

to HHHC Inc.[54]

50.     After HHHC Inc. was incorporated, Sue Yang "simply conducted the business under the same name and in the same place, with largely continuous customers and employees."[55]

51.     Sue Yang stated in an interrogatory answer that "[n]o price was paid" by HHHC Inc. for the assets of Happy Home Health Care, which included value as an ongoing business concern, customer lists, and goodwill.[56]

52.     Neither party submitted evidence of the monetary value of these assets.

53.     Based on Sue Yang's deposition testimony, IRS records, and HHHC Inc.'s bank statements, the Court finds that Sue Yang transferred Happy Home Health Care's assets to HHHC Inc. and began operating the business as a corporate entity in 2009, after he learned of his federal tax debt.

54.     Sue Yang did not report the sale or transfer of assets from Happy Home Health Care to HHHC Inc. to the IRS for either the 2007 tax year, when HHHC Inc. was incorporated, or the 2009 tax year, when the assets were transferred.[57]

55.     On March 18, 2010, Sue Yang prepared and filed HHHC Inc.'s first corporate tax return, for the 2009 tax year.[58]

56.     Sue Yang identified himself as an officer of HHHC Inc. on the signature

---

[54] Def. Ex. 51.
[55] Def. Ex. 49.
[56] Def. Ex. 49.
[57] *See* Def. Exs. 4, 30.
[58] Def. Ex. 30.

block of HHHC Inc.'s 2009, 2010, and 2011 corporate tax returns.[59]

57.     HHHC Inc. did not report any compensation to Sue Yang as a corporate officer for the 2009, 2010, or 2011 tax years.[60]

58.     HHHC Inc. reported no payment of dividends to its sole shareholder, Sue Yang, for the 2009, 2010, or 2011 tax years.[61]

59.     For tax year 2010, Sue Yang claimed $13,757 total income on his individual income tax return, $7,952 of which was classified as sole proprietor income.[62]

60.     For tax year 2011, Sue Yang claimed $10,662 total income on his individual income tax return, all of which was classified as sole proprietor income.[63]

61.     Even though in 2010 and 2011 he was an officer and employee of HHHC Inc. and was paid by HHHC Inc., Sue Yang classified himself as a sole proprietor on the aforementioned individual income tax returns for 2010 and 2011.[64]

62.     According to Sue Yang's deposition testimony, HHHC Inc. reported in 2011 that it paid Sue Yang $24,000 in salary and wages.[65]  Sue Yang reported only $10,662 in income on his 2011 personal income tax return, however, because he deducted as expenses more than half of the $24,000 HHHC Inc. reported paying him, claiming that he "used a lot of mileage to go visit clients and I spend a lot of time training and visiting,

---

[59] Def. Exs. 30, 31, 32.
[60] Def. Exs. 30, 31, 32.
[61] Def. Exs. 30, 31, 32.
[62] Def. Ex. 9.
[63] Def. Ex. 10.
[64] Def. Exs. 9, 10; Tr. 103:4-5.
[65] Def. Ex. 52 at 56:8-13.

translating.  So that's why I had a lot of expense[s] there for myself."[66]

63.     HHHC Inc. actually wrote checks to Sue Yang during 2011 totaling at least $60,600.[67]

64.     HHHC Inc. paid $20,589.21 to Sue Yang's wife in 2012.[68]

65.     IRS Revenue Agent Margaret Perez, a certified fraud examiner, reviewed HHHC Inc.'s corporate tax returns and bank statements and Sue Yang's and his wife's individual tax returns for 2011, 2012, and 2013 to determine if the amounts HHHC Inc. paid to Sue Yang and his wife were reflected on the tax returns.[69]

66.     Revenue Agent Perez concluded that Sue Yang underreported his income from HHHC Inc. by approximately $43,000 in 2011 and approximately $30,000 in 2012.[70]

67.     Revenue Agent Perez further concluded that Sue Yang's wife failed to report any of the income that she was paid by HHHC Inc. in 2012.[71]

68.     Revenue Agent Perez testified that cash in the amounts of $18,000, $18,500, and $11,250 was deposited into HHHC Inc.'s corporate bank account.[72]  The $18,000 cash deposit was made on June 8, 2011, by Paul Thao; the $18,500 cash deposit was made on January 2, 2013, by Sue Yang's wife; and the $11,250 deposit was made on

---

[66] Def. Ex. 52 at 52:12-16.
[67] Def. Ex. 46.
[68] Def. Ex. 46.
[69] Tr. 96:19-25, 97:1-5.
[70] Tr. 101:14-25, 102:1-10.
[71] Tr. 102:22-25, 103:1-3.
[72] Tr. 92:19-23; *see* Def. Ex. 48.

January 15, 2013, by Sue Yang.[73]  There was no corporate record reflecting the reason

for or purpose of these cash deposits.  These transactions were significant because all of

HHHC Inc.'s reported income should have been from federal or state sources or private

insurance.[74]

69.    In 2013, Sue Yang stated on an IRS Form 433 that he and his wife had

worked for Happy Home Health Care, not HHHC Inc., for the past nine years.[75]

**F.    Sue Yang's Use of HHHC Inc. Funds to Buy a House and for Other
Personal Expenses**

70.    On April 28, 2009, Sue Yang issued a check to "CASH" in the amount of

$49,290.58 from HHHC Inc.'s corporate bank account for the purpose of purchasing a

home in Brooklyn Park, Minnesota.[76]

71.    Sue Yang testified that the house was his, but was purchased by and titled

in the name of his brother, Kong Yang.[77]

72.    The check contains the notation "Cashier Check" in the "For" line.[78]

73.    In a response to an interrogatory, Sue Yang described the transaction as a

"personal loan from Sue Yang to Kong [Y]ang made through the business."[79]

74.    At trial, Sue Yang testified he personally agreed to make the loan and did

---

[73] Def. Ex. 48.
[74] Tr. 93:1-3.
[75] Def. Ex. 65.
[76] Tr. 43:25, 44:1-15, 44:24-25, 45:1, 45:7-8, Def. Ex. 24.
[77] Tr. 25:3-11, 39:2-4.
[78] Def. Ex. 24.
[79] Def. Ex. 49.

not document the loan in any corporate records.[80]

75.    Sue Yang's responses to requests for admission stated that the house was purchased in 2008 and that the funds used to purchase the house came from his personal bank account.[81]

76.    Kong Yang did not have sufficient funds to purchase the house and had been turned down for financing.[82]

77.    At first, Sue Yang, Kong Yang, their parents, and other family members all lived in the house, although the house was titled only in Kong Yang's name.[83]

78.    After Kong Yang moved out, Sue Yang and his family continued to live there, and Sue Yang continued to make the mortgage payments.[84]

79.    Household bills were directed to Sue Yang and his wife, not Kong Yang.[85]

80.    Sue Yang did not report the loan as an asset on HHHC Inc.'s corporate tax return.[86]

81.    HHHC Inc. did not report the $49,290.58 as officer's compensation or income to Sue Yang or Kong Yang.[87]

82.    Sue Yang testified the loan was repaid,[88] but he equivocated on the dates and documentation of the supposed repayment.  In a response to a request for admission,

---

[80] Tr. 46:11-23.
[81] Tr. 43:17-25, 44:1-25, 45:1-3.
[82] Tr. 39:5-14.
[83] Def. Ex. 16; Tr. 52:21-24, 156:24-25, 157:1, 157:8-12.
[84] Def. Ex. 30 at 6:7-9; Tr. 50:12-15, 157:4-5.
[85] Tr. 60:23-25, 61:1-12.
[86] Tr. 50:12-15, 106:18-20.
[87] Def. Ex. 30; Tr. 50:24-25, 51:1.
[88] Tr. 43:14-16, 74:1-12, 113:14-16.

Sue Yang stated Kong Yang repaid the loan in 2009 with two to three cash payments deposited in HHHC Inc.'s bank account.[89]  In his deposition, he testified there was no documentation that his brother had ever paid back the loan, only his brother's verbal assurances that he had.[90] At trial, he first testified that the loan had been repaid in its entirety in January 2009 and pointed to certain entries in HHHC Inc.'s bank records of documentation thereof.  But January 2009 predated the loan itself, so Sue Yang admitted on cross-examination that it had not been repaid at that time, that the entries he identified were not related to the loan repayment,[91] and that there was no record of a loan repayment in HHHC Inc.'s bank records for 2009.[92]  He then identified other entries in his bank records and testified the loan was repaid in installments between February 2010 and January 2013.[93]  Nothing in those entries, however, contained information corroborating Sue Yang's testimony that they represented repayment of the loan.

83.    When asked how he knew the entries showing deposits to HHHC Inc.'s bank account between February 2010 and January 2013 were in fact repayments of the loan, Sue Yang answered, non-responsively, that he made the deposits to pay employees and meet cash flow.[94]

84.    Based on Sue Yang's nonresponsive answer and his inconsistent responses in his deposition, at trial, and in his written discovery responses, the Court finds no

---

[89] Def. Ex. 50; *see* Tr. 151:21-25.
[90] Def. Ex. 67 at 19:20-22, 20:1-6.
[91] Tr. 136:2-17, 137:14-19.
[92] Tr. 152:11-13.
[93] Tr. 141:9-25, 147:21-25, 148:1-10.
[94] Tr. 148:11-24.

credible evidence the "loan" was ever repaid.

85.     Revenue Agent Perez testified that HHHC Inc. did not have enough income in 2009 to make the $49,290.58 loan.[95]

86.     Sue Yang admitted that HHHC Inc. did not have the money in 2009 to make the $49,290.58 loan.[96]  In fact, on a federal corporate tax return prepared by Sue Yang for tax year 2009, HHHC Inc. reported a $33 loss.[97]

87.     On April 15, 2009, Sue Yang wrote a check to "Minnesota Child Support Payment Center" from HHHC Inc.'s corporate account.[98]  There was no testimony or documentation suggesting this was a legitimate business expense of HHHC Inc., and the Court finds the check drawn on HHHC Inc.'s corporate account was issued to pay a personal obligation.

### G.     Paul Thao's Use of HHHC Inc. Funds for a Personal Expense

88.     On June 4, 2009, Paul Thao wrote a check from HHHC Inc.'s bank account to "Hennepin County Treasurer" in the amount of $1,523.18.  The "For" line reads: "Excel Energy County."[99]

89.     There is no evidence that Sue Yang knew about this check, or that the payment was for a personal expense of Sue Yang, such as his property taxes or a utility bill.  At the same time, there is no evidence the payment was for a legitimate business expense of HHHC Inc.

---

[95] Tr. 106:21-25, 107:1-4.
[96] Tr. 48:3-6.
[97] Def. Ex. 30; Tr. 46:24-25, 47:1-3.
[98] Def. Ex. 24.
[99] Def. Ex. 25; Tr. 54:2-6, 54:14-20.

### H.    Peev Tax Services

90.    Sue Yang's duties at Peev included preparing state and federal individual income tax returns.[100]

91.    Sue Yang's preparer tax identification number was revoked by the IRS in 2010.[101]  This effectively shut down Peev Tax Services, although Sue Yang continued to use the corporation's bank account.[102]

92.    Sue Yang used Peev's corporate bank account to pay for numerous household expenses, including a $6,753 fence, property taxes, waste management, utilities, and curbside waste collection.[103]

93.    Sue Yang admitted that Peev paid personal expenses on his behalf, but claimed he did not know why or how Peev accounted for his personal expenses for federal tax purposes.[104]

94.    Sue Yang withdrew from Peev's corporate bank account tens of thousands of dollars for gambling at local casinos.[105]

95.    Revenue Agent Perez testified that Sue Yang used Peev's bank account as his "personal bank account."[106]

96.    Sue Yang directed the IRS to deposit his tax clients' income tax refunds

---

[100] Def. Ex. 52 at 6-7.
[101] Tr. 48:10-11, 57:4-10.
[102] Tr. 57:18-25, 58:1-5.
[103] Def. Exs. 18-20; Tr. 58:16-20.
[104] Def. Ex. 52 at 39-40.
[105] Tr. 60:9-18; Def. Ex. 48.
[106] Tr. 107:20-21.

directly into Peev's corporate bank account.[107]

## I.   Credibility Findings

97.     Revenue Agent Perez was a credible witness, and the Court finds her

opinions regarding Sue Yang's tax returns to be well-founded.

98.     Sue Yang was not a credible witness concerning his financial interests and

activities, his reason for incorporating HHHC Inc., and his treatment of HHHC Inc. with

respect to its status as a separate corporate entity.  *Inter alia*, his testimony was often

inconsistent with his prior testimony or with his discovery responses, or inconsistent with

the documentary evidence; he did not adequately or believably explain apparent

improprieties or omissions in his tax returns and other documents filed with the IRS, even

though he was a trained income tax preparer; and he failed to adhere to even rudimentary

corporate formalities.  He claimed HHHC Inc. loaned nearly $50,000 in corporate funds

to his brother for the purchase of a family home, but failed to obtain proper security or

documentation.  He did not ensure that the loan was repaid, and his testimony on that

subject changed several times under cross-examination.  The house was and remains

titled in Kong Yang's name, even though Kong Yang no longer lives there and Sue Yang

and his family continue to live there.  In addition, Sue Yang falsely reported his income

from Happy Home Health Care and HHHC Inc.  He also claimed to be insolvent and

unable to pay his federal tax debt, but he purchased a $29,000 boat in cash that he and his

wife failed to report on a sworn IRS Form 433-A.  He also gambled with tens of

thousands of dollars from Peev's corporate account, used Peev's corporate account as his

---

[107] Tr. 64:12-19.

personal bank account, and paid numerous personal expenses from that account.  While

he admitted that he treated the Peev corporate entity as an alter ego and is not seeking to

overturn the levies against that entity's assets, the Court nevertheless finds his use of

Peev's corporate account for personal expenses is relevant to his credibility overall.

## II.     PROPOSED CONCLUSIONS OF LAW

1.     Title 26 U.S.C. § 7426 permits a person or entity to bring an action for

wrongful levy against the United States.[108]

2.     "In a wrongful levy action under 26 U.S.C. § 7426, there is an initial

burden on the plaintiff to prove it has an interest in the property and that the government

levied on the property because of tax assessments against another person, a taxpayer.

The burden then shifts to the government to prove the nexus between the property and the

taxpayer . . . .  The plaintiff has the ultimate burden of proving that the levy was wrongful

and should be overturned."[109]

3.     The United States can meet its burden to prove a nexus between the

property and the taxpayer by showing that the entity was used as the taxpayer's alter ego

or that the taxpayer fraudulently conveyed property to another.[110]

4.     The Eighth Circuit Court of Appeals has not decided whether the quantum

---

[108] 26 U.S.C. § 7426(a)(1).

[109] *Xemas, Inc. v. United States*, 689 F. Supp. 917, 922 (D. Minn. 1988), *aff'd*, 889 F.2d 1091 (1989) (unpublished); *see also Scoville v. United State*s, 250 F.3d 1198, 1201 (8th Cir. 2001) ("To prevail" in a wrongful levy action brought pursuant to § 7426, "a plaintiff must demonstrate 'an interest . . . superior to the United States' interest in the property, and that the levy was wrongful.'") (quoting *Bremen Bank & Trust Co. v. United States*, 131 F.3d 1259, 1262 (8th Cir.1997)).

[110] *United States v. Scherping*, 187 F.3d 796, 801 (8th Cir. 1999) (alter ego); *Xemas*, 689 F. Supp. at 922 (fraudulent conveyance).

of evidence for the United States is "substantial evidence" or a "preponderance of the evidence."[111]

### A.     HHHC Inc. Met Its Initial Burden

5.      HHHC Inc. met its initial burden to prove it had an interest in the property levied by the United States and that the United States levied the property because of tax assessments against Sue Yang.  The United States does not contest these conclusions.

### B.     The United States' Alter Ego Theory of Nexus

6.      If a corporation is the alter ego of a taxpayer, "[p]roperty held in the name" of the corporation "may be levied on to satisfy the tax liabilities of the taxpayer."[112]

7.      Generally, federal courts rely on state law to determine whether an entity is the alter ego of the taxpayer.[113]

8.      Minnesota courts employ a two-step analysis.  First, "the court considers the relationship between the individual and the entity."  Second, "the court considers the relationship between the entity and the party that seeks to disregard it; only if the entity has operated in a fraudulent or unjust manner toward that party will the entity be disregarded."[114]

9.      In the first step of the analysis, relevant factors include "insufficient capitalization for purposes of corporate undertaking, failure to observe corporate

---

[111] *Scoville*, 250 F.3d at 1201 (citing *Oxford Capital Corp. v. United States*, 211 F.3d 280, 283 (5th Cir. 2000) (requiring "substantial evidence"); *Flores v. United States*, 551 F.2d 1169, 1176 n.8 (9th Cir. 1977) (requiring a "preponderance of the evidence")).
[112] *F.P.P. Enters. v. United States*, 830 F.2d 114, 118 (8th Cir. 1987); *see Scherping,* 187 F.3d at 801-02.
[113] *Scherping*, 187 F.3d at 802.
[114] *Id.*

formalities, nonpayment of dividends, insolvency of debtor corporation at time of

transaction in question, siphoning of funds by dominant shareholder, nonfunctioning of

other officers and directors, absence of corporate records, and existence of corporation as

merely facade for individual dealings."[115]  A number of these factors must be present to

disregard the corporate form.[116]

      10.    **Insufficient capitalization**.  HHHC Inc. was sufficiently capitalized for the

purpose of conducting business.  HHHC Inc. received all of its income directly from the

Minnesota Department of Human Services through a legitimate billing and

reimbursement process.  HHHC Inc. paid its employees' wages and other business

expenses from its corporate bank account, and except for workers compensation

insurance, there was no evidence that payments were late or expenses went unpaid.  This

factor weighs against a conclusion that HHHC Inc. was Sue Yang's alter ego.

      11.    **Failure to observe corporate formalities**.  Sue Yang and HHHC Inc. did

not observe numerous corporate formalities.  Sue Yang did maintain a separate bank

account for HHHC Inc. into which payments by insurers and state agencies were made

and out of which employees were paid.  HHHC Inc. was also licensed in its own name to

provide home health care services.  And, beginning in 2009, the corporation filed tax

returns.  However, the corporation did not issue stock certificates to Sue Yang or others;

hold shareholders or directors meetings; maintain records of stock issuance, ownership,

---

[115] *Victoria Elevator Co. of Minneapolis v. Meriden Grain Co., Inc.*, 283 N.W.2d 509,
512 (Minn. 1979).
[116] *Id.*

or transfer; or maintain records of the appointment of directors or the appointment of and delegation of authority to corporate officers.  Sue Yang testified that Paul Thao owned 50% of HHHC Inc., but Sue Yang did not document the issuance or transfer of any stock to Paul Thao, or record any consideration paid by Paul Thao either to HHHC Inc. or to Sue Yang for that ownership interest.  There is no corporate record establishing or delegating authority to Paul Thao or Kong Yang as vice presidents, even though both are named as vice presidents and signatories on HHHC Inc.'s corporate bank account.  There was also no documented sale or asset transfer between Happy Home Health Care and HHHC Inc.  Sue Yang's and HHHC Inc.'s failure to observe these and other corporate formalities weighs in favor of concluding that HHHC Inc. was Sue Yang's alter ego.[117]

12.    **Nonpayment of dividends**.  No dividends were ever declared or paid to Sue Yang or any other purported shareholder, but because of the irregularities in the corporate tax returns it is not clear whether the corporation ever turned a profit.  Therefore, this factor weighs only slightly in favor of concluding that HHHC Inc. was Sue Yang's alter ego.[118]

13.    **Insolvency of corporation**.  HHHC Inc. did not become insolvent until the United States levied on its corporate bank account and State of Minnesota reimbursement payables.  However, Sue Yang and his proprietorship Happy Home Health Care were insolvent at the time Sue Yang began operating HHHC Inc. as a corporation.  Therefore,

---

[117] *Cf. Victoria Elevator*, 283 N.W.2d at 513 (finding that corporate officer followed corporate formalities by holding shareholder and director meetings and issuing stock certificates).

[118] *Id.* ("The corporation paid no dividends.").

this factor favors a conclusion that HHHC Inc. was Sue Yang's alter ego.

14. **Siphoning of funds by dominant shareholder**.  Sue Yang siphoned some

funds from HHHC Inc., most notably the $49,290.58 "loan" used to purchase the house

in which he and his family continue to live.  The large amount of the loan; the lack of

proper documentation of the payee and the intended use of the funds; the timing of the

loan when HHHC Inc. did not have the funds to make the loan; the failure to report the

loan as an asset to HHHC Inc. or as a dividend, income, or compensation to Sue Yang;

Sue Yang's description of the loan as a "personal loan"; and the uncertainty regarding

when or whether the loan was repaid and by whom are significant—significant enough to

support a conclusion that Sue Yang not only siphoned a large amount of money from

HHHC Inc. for a personal expense (the purchase of a family home) but also felt he could

do so at will, without proper documentation, and without attending to whether and when

it would be repaid.  A corporate officer's withdrawal of funds when a corporation is in

financial trouble, without proper documentation or reporting to the IRS, supports a

conclusion that the individual "did not clearly distinguish between property owned by

himself as an individual and property owned by the corporation."[119]  Moreover, an

officer's failure to make a formal record of transactions such as loans indicates that the

individual did not treat the corporation as a separate entity.[120]

There is additional evidence of siphoning in the form of a check issued by Sue

Yang to "Minnesota Child Support Payment Center" from HHHC Inc.'s corporate

---

[119] *Id.* at 512-13 & n.7.
[120] *Id.* at 513.

account in April 2009. This payment was made to satisfy a personal obligation, not a business expense. In addition, Sue Yang's actual income from HHHC Inc., as evidenced on checks written to him from the corporate bank account, was far higher than the income HHHC Inc. reported paying on its corporate tax returns.

Concerning the HHHC Inc. check issued by Paul Thao to the Hennepin County Treasurer, there was no evidence Sue Yang directed the payment to be made or that it paid a bill connected with his residence, but neither does it appear to be a legitimate expense of HHHC Inc. Although it does not appear the money was siphoned by Sue Yang, the payment for the apparent benefit of a family member lends further support to the lack of recognition of the formal corporate status of HHHC Inc.

While Sue Yang admittedly used *Peev*'s corporate account much more frequently to pay personal expenses, the Court does not find that to be credible support for his claim that, by contrast, he regarded and treated HHHC Inc. as a separate, formal corporate entity.

On balance, this factor weighs in favor of concluding that HHHC Inc. was Sue Yang's alter ego. While Sue Yang does not appear to have *frequently* siphoned funds from HHHC Inc., he did so on more than one occasion. Further, the "personal loan" to Kong Yang totaled nearly $50,000, far more than HHHC could afford to lend, and there is no documentation that the loan was ever repaid.

15. **Nonfunctioning of other officers and directors**. Sue Yang was an officer of HHHC Inc. At some point, Paul Thao and Kong Yang were represented on TCF Bank documents as vice presidents of HHHC Inc. with authority to sign checks drawn on the

HHHC Inc. corporate account.  There are no corporate records of HHHC Inc., however, appointing or delegating authority to them or other officers.  There is also no documentation of any appointment of directors or minutes of board of directors meetings. Accordingly, this factor is neutral.[121]

16.    **Absence of corporate records**.  The only corporate records submitted by HHHC Inc. were the Certificate of Incorporation, Articles of Incorporation, and bank records.  The United States also submitted corporate tax returns.  Noticeably absent from the corporate records is documentation of the loan to Kong Yang for the house purchase. Sue Yang wrote the check to "CASH," rather than Kong Yang as payee.  Sue Yang did not report the loan as an asset to HHHC Inc. or officer compensation on the corporate tax return that he prepared and signed.  Based on information in the corporate tax return prepared by Sue Yang, HHHC Inc. did not have sufficient funds to make the loan.

Also absent from the corporate records is accurate information about payments made to Sue Yang.  The income reported by HHHC Inc. as paid to Sue Yang did not correspond with Sue Yang's individual income tax records, and the actual payments made by HHHC Inc. to Sue Yang, as evidenced by checks written to him from the corporate bank account, did not correspond with the income HHHC Inc. reported paying on its corporate tax returns, nor are there corporate records that provide another explanation for those payments.  Moreover, there are deposits into the corporate bank account for which there is no explanatory documentation.  The Court concludes that

---

[121] *See Malcolm v. Franklin Drywall, Inc.*, No. Civ. 06-4155 (PAM/JSM), 2009 WL 690082, at *4 (D. Minn. Mar. 12, 2009) (finding that where there were no other officers or directors, this factor was "inapplicable").

although there is not a complete absence of corporate records, the missing and erroneous corporate records support a conclusion that HHHC Inc. was Sue Yang's alter ego.

17. **Existence of corporation as mere facade for individual dealings**. HHHC Inc. was a legitimate home health care business that provided home health care workers to individual clients and employed between 85 and 100 employees at any given time. HHHC Inc. was licensed and regulated by the State of Minnesota. It was audited every year, and its license was never terminated. As for the loan made to Kong Yang, the Court has already considered this transaction in its discussion of other factors. On balance, the Court concludes that HHHC Inc. did not exist as a mere facade for Sue Yang's individual dealings.

18. The Court concludes that the above factors, which relate to the first prong of the alter ego analysis, weigh in favor of concluding that HHHC Inc. was Sue Yang's alter ego.

19. The Court now turns to the second prong of the alter ego analysis: consideration of the relationship between HHHC Inc. and the United States and whether HHHC Inc. operated in a fraudulent or unjust manner toward the United States. This step requires the United States to show "an element of injustice or fundamental unfairness."[122] To meet this standard, "proof of strict common law fraud is not required, but, rather, evidence that the corporate entity has been operated as a constructive fraud or in an unjust manner must be presented."[123]

---

[122] *Victoria Elevator*, 283 N.W.2d at 512.
[123] *White v. Jorgenson*, 322 N.W.2d 607, 608 (Minn. 1982) (quotation omitted).

20.     The Court concludes that Sue Yang operated HHHC Inc. in an unjust manner toward the United States.  Sue Yang knew when he began operating HHHC Inc. in 2009 that he had incurred a large federal tax debt that would have been collectible from the assets of his sole proprietorship.  Sue Yang transferred the assets and the business of Happy Home Health Care to HHHC Inc. not long after learning of the substantial taxes, penalties, and interest assessed by the IRS.  In addition, HHHC Inc., through Sue Yang, made a loan of almost $50,000 to pay for Sue Yang's residence, when that money could have been used to satisfy Sue Yang's tax debt.  Furthermore, HHHC Inc. concealed the details of the transaction from the IRS.  HHHC Inc. did not report the loan as an asset or as officer compensation.  HHHC Inc. accepted cash deposits from Sue Yang that Sue Yang could have used to pay his federal tax debt.

21.     For the reasons set forth above, the Court concludes the United States has met its burden to prove a nexus between Sue Yang and the levied funds by showing that HHHC Inc. was Sue Yang's alter ego.

22.     The Court need not decide whether the requisite quantum of evidence is "substantial evidence" or "a preponderance of the evidence," because the evidence here satisfies both standards.[124]

23.     The burden of proof now shifts back to HHHC Inc. to prove that the levies were indeed wrongful and should be overturned.[125]

24.     HHHC Inc. "does not dispute that, if the Defendant meets its burden to

---

[124] *See Scoville*, 250 F.3d at 1201.
[125] *Id.*

show nexus, i.e. demonstrates that alter-ego principles apply, there is no residual 'wrongfulness' for the Plaintiff to demonstrate in this case.  This case therefore comes down to the Defendant's burden to show nexus . . . ."[126]

25.     The Court concludes, in light of the United States' proof, that HHHC Inc. has not met its ultimate burden to show the levies were wrongful.[127]

## C.     Probable Cause

26.     HHHC Inc. argues that even if the United States has shown a nexus between the levied funds and Sue Yang, the United States has not shown that the IRS had probable cause to believe, at the time the levies were issued, that the property to be seized was properly that of Sue Yang.

27.     The authority on which HHHC Inc. relies to argue that if the IRS did not have probable cause at the time the levy was issued, the levy was wrongful, is a concurring opinion to a decision by the Fifth Circuit Court of Appeals.[128]

28.     The Eighth Circuit Court of Appeals explicitly declined to decide in *Scoville* whether the United States must prove it had probable cause for a levy when the levy was issued, because in that case there was evidence the IRS knew when it issued the levy that the taxpayer had an interest in the seized property.[129]

29.     The sole evidence of probable cause found sufficient in *Scoville* was that, prior to the levy being issued, "a former colleague of [the taxpayer] informed the IRS that

---

[126] (Pl. Proposed R. & R. at 3 [Doc. No. 58].)
[127] *See Xemas*, 689 F. Supp. at 923.
[128] (Pl. Proposed R. & R. at 3 [Doc. No. 58] (citing *Oxford Capital Corp. v. United States*, 211 F.3d 280, 286-89 (5th Cir. 2000) (Dennis, J., concurring).)
[129] *Scoville*, 250 F.3d at 1201 n.3.

[the taxpayer] had told him that he had divorced [his wife] in order to put his . . . house and office equipment in her name."[130]

30.    Similarly, here, without deciding whether the United States must establish probable cause, the Court concludes that the IRS had probable cause to believe that Sue Yang was operating HHHC Inc. as his alter ego and therefore had an interest in the levied funds at the time the IRS issued the Notices of Levy.  After auditing Sue Yang's individual tax returns including the Schedule C forms for his sole proprietorships for tax years 2005-2008, all of which were prepared and filed by Sue Yang, the IRS determined that Sue Yang had falsely claimed refunds, failed to report interest income, underreported other income including self-employment income, and overstated expenses for Happy Home Health Care.  Based on information provided in the returns and the results of the audits, the IRS concluded that Sue Yang had committed fraud on his tax returns and therefore assessed substantial fraud penalties, in addition to other penalties, taxes, and interest.  The total amounts due were $44,449.48 for 2005; $41,860.08 for 2006; $93,219.20 for 2007; and $69,473.26 for 2008.  Sue Yang did not contest these determinations, nor did he make any attempt to pay the amounts owed.  The IRS knew of Sue Yang's inaccurate and fraudulent tax reporting history when it issued the levies in 2013. Then, on March 18, 2010, Sue Yang prepared and filed a corporate tax return on behalf of HHHC Inc. for tax year 2009.  This marked a significant change from the Schedule C forms Sue Yang had filed for Happy Home Health Care in the past.  The

---

[130] *Id.*

timing and nature of this change, just after the substantial tax debts were imposed for tax years 2005-2008, suggest that Sue Yang was attempting to use HHHC Inc., an incorporated entity, to shield his assets from the IRS.   In addition, no sale or transfer of any assets from Happy Home Health Care to HHHC Inc. was reported to the IRS, for either the 2007 or 2009 tax year.  Such conduct demonstrated both a failure to follow corporate formalities and an absence of corporate records.  Nor did HHHC Inc. report any compensation to Sue Yang as a corporate officer in 2009, 2010, or 2011.  By contrast, Sue Yang had reported a $49,264 profit from his sole proprietorship Happy Home Health Care for tax year 2008.  HHHC Inc.'s failure to report any officer compensation for Sue Yang in 2009, 2010, or 2011 suggests that Sue Yang was concealing compensation by siphoning funds or misusing HHHC Inc. for his personal dealings.  HHHC Inc. also reported no payment of dividends to Sue Yang for the 2009, 2010, or 2011 tax year.  The IRS knew of Sue Yang's failure to follow corporate formalities and maintain accurate corporate records when it issued the levies in 2013.

31.     Furthermore, for tax year 2010, Sue Yang claimed $13,757 total income on his individual income tax return, $7,952 of which was classified as sole proprietor income.  For tax year 2011, Sue Yang claimed $10,662 total income on his individual income tax return, all of which was classified as sole proprietor income, even though he was actually an HHHC Inc. employee.  HHHC Inc. reported in 2011, however, that it paid Sue Yang $24,000 in salary and wages.  Moreover, as an officer of HHHC Inc., Sue

Yang was not a sole proprietor, but an employee.[131]  Sue Yang's classification of himself as a sole proprietor, rather than an HHHC Inc. employee, on his individual income tax returns avoided the obligation for HHHC Inc. to issue IRS 1099 forms for payments made to him as an employee.  The classification was also inconsistent with HHHC Inc.'s 2009, 2010, and 2011 corporate tax returns, on which Sue Yang identified himself as a corporate officer.  These actions and discrepancies indicate that Sue Yang disregarded corporate formalities such as maintaining accurate records and filing accurate tax returns, and this information was known to the IRS before the levies were issued.

32.     Based on the above, the Court concludes the IRS had probable cause to connect HHHC Inc.'s assets to Sue Yang through an alter ego theory of nexus before the levies were issued.

**D.     The United States' Fraudulent Conveyance Theory of Nexus**

33.     In the alternative to an alter ego theory of nexus, the United States argues a nexus between the levied funds and Sue Yang was created by Sue Yang's fraudulent conveyance of property from Happy Home Health Care to HHHC Inc.

34.     "Minnesota follows the traditional approach to corporate successor liability."[132]  Generally, where one company sells or otherwise transfers all of its assets to another company, the transferee is not liable for the debts and liabilities of the transferor.[133]

---

[131] 26 U.S.C. § 3121(d)(1).

[132] *Niccum v. Hydra Tool Corp.*, 438 N.W.2d 96, 98 (Minn. 1989).

[133] *J.F. Anderson Lumber Co. v. Myers*, 206 N.W.2d 365, 368-69 (Minn. 1973) (quotation omitted).

35.     There are exceptions to the general rule, however.  For example, a transferee corporation will be liable for the debts and liabilities of a transferor "where the transaction is entered into fraudulently in order to escape liability for . . . debts."[134]  "A company may be held liable for the debts and liabilities of a judgment debtor if the debtor's assets are fraudulently transferred to the company in order for the debtor to escape liability for such debts."[135]

36.     Another exception, which may be also incorporated as an element of the foregoing exception, "is the absence of adequate consideration for the sale or transfer."[136] A transfer of assets without reasonable consideration to a corporation with the same ownership, through which the claims of creditors are defeated, falls within the fraudulent transaction exception.[137]

37.     The Minnesota Fraudulent Transfers Act provides that a transfer is fraudulent if it was made "with actual intent to hinder, delay, or defraud any creditor of the debtor."[138]  "Transfer" includes "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance."[139]

38.     In considering whether there was actual intent to hinder, delay, or defraud a

---

[134] *Id.* at 369 (quotation omitted).

[135] *Schwartz v. Virtucom, Inc.*, No. A08-1059, 2009 WL 1311816, at *3 (Minn. Ct. App.), *rev. denied* (July 22, 2009).

[136] *J.F. Anderson*, 206 N.W.2d at 369 (citation omitted).

[137] *Id.* (quotation omitted).

[138] Minn. Stat. § 513.44(a)(1) (2008).

[139] Minn. Stat. § 513.41(12) (2008).

creditor, courts may consider the factors set forth in Minn. Stat. § 513.44(b).  Some of the

relevant factors are whether: (1) "the debtor retained possession or control of the property

after the transfer"; (2) "before the transfer was made . . ., the debtor had been sued or

threatened with suit"; (3) "the value of the consideration received by the debtor was

reasonably equivalent to the value of the asset transferred or the amount of the obligation

incurred"; (4) "the debtor was insolvent or became insolvent after the transfer was made

or the obligation was incurred"; and (5) "the transfer occurred shortly before or shortly

after a substantial debt was incurred."[140]  Whether the corporation was the debtor's alter

ego is also relevant.[141]

39.     Sue Yang was indebted to the United States before the transfer of the assets

from Happy Home Health Care to HHHC Inc. in 2009.  The United States became a

creditor of Sue Yang when his 2005 tax return was due to be filed and the taxes due to be

paid.[142]  Sue Yang was first audited by the IRS in 2008, the year before HHHC Inc.

began operating as a corporation.  Sue Yang's tax liability increased as a result of the IRS

audits in 2008 of his 2005 and 2006 tax returns, which resulted in substantial additional

taxes, penalties, and interest.  HHHC Inc. paid no monetary consideration for Happy

Home Health Care's assets.  Because of the lack of corporate records, it is unclear

whether or to what extent stock was issued to Sue Yang in consideration for the transfer.

Although neither party introduced evidence of the monetary value of the transferred

assets, Sue Yang was able after the transfer to continue operating the business "under the

---

[140] Minn. Stat. § 513.44(b) (2008).
[141] *Scherping*, 187 F.3d at 805.
[142] *See id.*

same name and in the same place, with largely continuous customers and employees."

Once Sue Yang began operating HHHC Inc. in 2009, Happy Home Health Care ceased

operations and became insolvent. Sue Yang was also insolvent, unable to pay his debts

and having lost his home to foreclosure in 2008. Sue Yang, through HHHC Inc., retained

complete control of Happy Home Health Care's assets and property after the transfer.

HHHC Inc. was Sue Yang's alter ego. In light of these badges of fraud, the Court

concludes the transfer of assets from Happy Home Health Care to HHHC Inc. was made

with actual intent to defraud the United States.[143]

40.     The levies on HHHC Inc. were proper because Sue Yang fraudulently

transferred the assets of Happy Home Health Care to HHHC Inc. for the purpose of

escaping liability for his federal tax debt.

41.     HHHC Inc. has not met its burden to show the conveyances were not

fraudulent.

42.     HHHC Inc. argues that transferee liability is limited to the assets that were

fraudulently transferred into a corporation and does not extend to the corporation's

general assets, but does not cite any law to support this position.[144]

43.     Where there is evidence of both fraudulent conveyances and alter ego, the

United States may levy on not only the actual property that was fraudulently conveyed to

---

[143] *See Valley Min., LLC v. United States*, Civ. No. 06-3667 (JRT/FLN), 2012 WL
5389976, at *7 (D. Minn. Oct. 1, 2012) (concluding taxpayers fraudulently conveyed
assets because they did not receive "a reasonably equivalent value in exchange and
because the transfer rendered them unable to pay their income tax liabilities," at a time
when they knew of their tax liability).
[144] (Pl. Proposed R. & R. at 6 [Doc. No. 58].)

the entity but also the monetary distributions from the entity.[145]  "Property held in the name of an entity which is the alter ego of a taxpayer may be levied on to satisfy the tax liabilities of the taxpayer."[146]  Similarly, where property is fraudulently transferred, the United States may levy on funds such as shareholder distributions from the transferee corporation,[147] as well as funds in the transferee's bank account.[148]

44.     In light of the foregoing, and because HHHC Inc. was Sue Yang's alter ego and the recipient of fraudulently conveyed property, the United States properly levied on HHHC Inc.'s accounts and reimbursement payables to satisfy Sue Yang's tax liability.

Accordingly, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.     Plaintiff HHHC Inc.'s Complaint [Doc. No. 1] be **DISMISSED WITH PREJUDICE**; and

---

[145] *F.P.P. Enters. v. United States*, 830 F.2d at 117-18 (concluding that because the trusts were the taxpayer's alter ego and property had been fraudulently conveyed into the trusts, the United States could levy on not only the actual property that was fraudulently conveyed into the trusts but also the monetary distributions from the trust).

[146] *Id.* at 118.

[147] *Valley Min.*, 2012 WL 5389976, at *8 (where the taxpayer's interest in an entity was fraudulently conveyed, upholding the United States' levy on shareholder distributions from the transferee corporation).

[148] *Loving Saviour Church v. United States*, 728 F.2d 1085, 1086 (8th Cir. 1984) (holding that, where real and personal property had been fraudulently conveyed, the United States properly levied on transferee's bank accounts, as well as the property actually conveyed).

2.      Judgment be entered in favor of Defendant United States of America.


Dated: April 13, 2016

 s/ Hildy Bowbeer
HILDY BOWBEER
United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.  Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.